State *v.* Miller.

---

### The State *v.* Emanuel Miller *et al.*

LIEN OF RECOGNIZANCE. While since the Code of 1858 no statute of England is in force in this State, yet the principles and rules of law which may originally have grown out of the provisions of ancient English statutes, and been adopted as rules of property and settled principles of law, were not annulled by the Code of 1858, and this court, prior to 1858, having under such statutes declared that recognizances were liens in the county where taken, this law is still in force, but the lien does not extend beyond the county where the recognizance was entered into.

---

#### FROM UNION.

---

Appeal from the Chancery Court at Maynardville. W. B. STALEY, Ch.

J. L. ROGERS and ATTORNEY-GENERAL LEA for the complainants.

WASHBURNE & TEMPLETON and HENDERSON & JOUROLMON for defendants.

FREEMAN, J., delivered the opinion of the court.

This bill is filed by the State to enforce the lien of a recognizance.

The defendants, in 1880, became bound in the form of a recognizance of record in the circuit court of Claiborne connty for the appearance of certain parties, at next term of the court, to answer the State in several cases in which they were charged with felonies.    There were four undertakings in as many cases in the sum of $1,000 each.

The parties failed to appear, and judgments *nisi* had; as is our practice, *sci. fa.* issued to show cause why these judgments should not be made absolute, and no defense being made, the same was done; after this an execution issued, which was returned *nulla bona.* In the meantime, after the recognizances had been entered into, but before final judgment rendered on the same, Emanuel Miller, the surety, conveyed the land sought to be subjected in this case to his brother and co-defendant, Pleasant Miller, who now holds it.    It is not averred that this conveyance was fraudulent, or made with the purpose to prevent appropriation of the land to meet this obligation.

This bill is filed to enforce the assumed lien on the land created by the recognizance of record.    The land does not lie in the county of Claiborne where the recognizance was taken, but in the adjoining county of Union.

An equity is sought to be raised against Pleasant Miller, the purchaser, on the allegation that he was

present in court when his brother, Emanuel Miller, was examined touching his ability to respond to the obligations entered into, and heard him qualify as surety on the basis of owning this land in Union county. This, however, we take it, does not materially affect the legal questions raised.

The bill was demurred to, and the demurrer overruled, from which there is an appeal to this court.

Two questions are raised, and very earnestly urged for reversal of this holding.

First. It is insisted, that no lien exists since the adoption by enactment of the Legislature of the Code, which took effect May 1st, 1858, and especially by virtue of section 41 of said Code, providing that all public and general acts passed prior to the present session of the General Assembly, all public and special acts, the subjects of which are revised in this Code, except acts creating special courts, subject to the limitations and with the exceptions herein expressed, are hereby repealed." We need not notice the exceptions and limitations referred to, as they have no bearing on the question.

Second. It is insisted, that conceding a lien does exist, it does not extend to lands owned by the cognizor beyond the county in which the recognizance is taken, simply by virtue of the recognizance.

Both these questions are of interest, and neither, in the form presented, have been raised or decided in any case by this court. It was held in the case of *State* v. *Wynne,* 3 Sneed, 393, and in 3 Head, 173, that a recognizance fixed a lien on the lands of the

State *v.* Miller.

cognizor from the time of its acknowledgment of record. This was, however, before the adoption of the Code, and the land held bound in these cases lay in the county where the recognizance was taken. The question of what is the effect of the Code legislation, and whether the effect of a recognizance, assuming the lien to still exist, is to extend beyond the county where the same is taken, are phases not passed upon, and are now to be considered for the first time.

The argument on the proposition that no lien exists, since the Code is based on the proposition that by the ancient common law, neither a judgment, recognizance, or any like form of liability, created any lien upon lands, but this effect was given in England by several statutes enacted by Parliament, some or all of which were held in force in our State before the Code. It is then insisted that since the Code no statute, except such as are therein provided for, are in force in this State, therefore the decisions based on the law, as founded on these English statutes, are not authorlty—on the contrary, it is maintained that no such lien being given by the Code, none exists.

The fact is, that no lien did exist at common law by virtue of a judgment or recognizance. The statute merchant was given by 11th Edward I., and amended by 13th of same reign, and the recognizance in the nature of a statute staple by 23 Henry VIII., ch. 6, and are said all to agree in this, that they are recorded acknowledgments of a debt, which not being paid at a certain day, the sheriff is authorized to deliver the lands, as well as the goods of the

debtor, to the creditor, "by a reasonable *extent* to hold them until such time as the debt is wholly levied." See Cross on Levies, Law Lib., top page 129. And this liability was held to fasten on lands which the debtor had at the time of its acknowledgment, though he should afterwards sell them, and to all after-acquired lands. *Ibid,* 2 Bac. Abr., 698. The lien was by construction of the courts not expressly given by statute. Out of these enactments most certainly came the rule declared by the courts of a lien fixed on the land, such as was approved by this court in the cases of 3 Sneed and 3 Head's Rep. No reference is had to these statutes in those cases, but they are based on North Carolina cases, which adopt the English rule derived from the construction of these statutes referred to by the courts of England.

The question whether since the Code any statute of England, as such, is in force in this State depends upon a fair construction of the Code in relation to the law as it then stood, and what is enacted by it, as well as its general intent and scope, as shown by the enactment itself. The act of 1715 was adopted from North Carolina, by virtue of Article II. of Constitution of 1834, providing "that all laws and ordinances now in force and use in this State, etc., shall continue in force and use until they expire, be altered or repealed by the Legislature."

That act provided, section 6: "The common law is and shall be in force in this government, except such part in the practice in issuing and return of writs and proceedings in the court of Westminster,

State *v.* Miller.

which, for want of several officers, cannot be used." Section 7: That "all laws of England providing for the privileges of the people and security of trade, as also all statute laws made for the limitation of actions, and preventing vexatious lawsuits, and preventing immorality and fraud, and for confirming inheritances and titles of land, are and shall be in force here, although the plantations are not named." By the act of 1778, section 2: It was provided substantially "that such parts of the common law as was heretofore in force, and the acts of the late General Assemblies not inconsistent with or repugnant to the · freedom and independence of the people or the form of government established, were to continue in force."

Under these statutes, it was held the statutes contemplated as in force were those passed before the fourth year of James I., 1607, when the charter of the Colony was granted. See N. & C., 438; 1 Tenn., 154. Under these provisions many English statutes were held by the courts in force as statutes in Tennessee, a list of which will be found in a note by Judge Cooper to case of *Glasgow* v. *Smith & Blackwell,* Overton Rep., 168–9. Among these we may mention the statute of limitations of 21 James I., except so far as changed by the act of 1715, ch. 27. See App. N. & C., 770. So the law stood at the time of the enactment of the Code.

This body of statutes, as we know, was passed as a whole by the Legislature, the act found on first page being entitled as follows: "An act to revise the statutes of the State of Tennessee,"—the act itself being,

40—VOL. 11.

"Be it enacted by the General Assembly of the State of Tennessee, That the general statutes of the State of Tennessee shall be as follows, to wit :"—then follows the entire compilation known as the Code of 1858.

It would seem that if we stopped here there could be no statute law in the State of Tennessee after this, except such as subsequent Legislatures might enact. It certainly was intended that this Code should contain all the statutes in force in the State. However, to specify more definitely what was intended, section 41 was inserted, expressly repealing all statutes previously passed, and all public and special acts the subjects of which are revised, with the exceptions therein specified.

The statutes we have cited from, N. & C. revised, had been passed, and were public and general acts, passed prior to this enactment. By these acts certain English statutes were adopted as in force in this State. But these acts of our Legislature are definitely repealed by the Code we have cited, and no like enactment made, nor are they included in the exceptions found in section 41.

It follows necessarily that all laws which adopted and kept in force any English statute previous to this time, as a statute of the State of Tennessee, being repealed, and a new body of statute law having been compiled and enacted, embracing all the subjects of our former statute law, no statutes were to be henceforward in force except such as are provided for. For instance, the statute of James, as well as other provisions of our statute of limitations of personal ac-

tions, was in many respects changed in the Code. No one has ever doubted but that the Code contains all our law on this subject.

For these reasons we have no doubt of the proposition, that no English statute as such is in force in our State since the Code.

But while we have no doubt on this question, we do not think it follows that all principles and rules of law that had been adopted by our courts, that may originally have grown out of the provisions of ancient English statutes, are necessarily to be held as swept away, or abrogated as established law among us.

This is well illustrated in the doctrine established by numerous cases in our State, that a resulting trust, where one pays the money for land, and the title is conveyed by his request to a third person, shall be subject to execution at law, the lien of the judgment attaching to it. See *Smitheal* v. *Gray*, 1 Hum., 491, with the cases cited in Judge Cooper's head note.

This principle came originally from the statute of 29th Charles II, ch. 3, sec. 10, which empowers "sheriffs, etc., to make and deliver execution upon any judgment, statute staple or recognizance, of all such lands, tenements, etc., as any other person or persons shall be seized or possessed of in trust for the party against whom execution shall be served, like as if the party had been seized of such lands, tenements, etc., *of such estate as they be seized of* in trust for *him at the time of said execution sued.*" See Statutes cited; Cross on Liens, top page 131; *Shute* v. *Harder*, 1 Yer., p. 8.

Numerous cases since the Code have adopted the principle thus introduced into our law, it having become a settled rule of property long recognized. But this no more went on the idea that the English statute was in force, or involved it, than does the fact that a large mass of our law as familiarly administered in our courts, especially our courts of equity, is derived from the Roman law, involved the proposition that the civil law as such is in force to any degree in our State.

So we hold the cases referred to in 3 Sneed and 3 Head have announced a rule of law originally derived from old English statutes, or resulting from them by construction of the courts, but which have been adopted as rules of property and settled principles governing this question, as rules of law in accord with sound public policy, and therefore should not be disturbed or abrogated, or overruled, except on the same principles, and for the same reasons we would overrule any other rule of law heretofore announced by this court. We see nothing in the rule contravening sound policy so far as the rule has been heretofore applied in fixing a lien on the lands of a cognizor situated in the county where the recognizance is taken. It is a record liability openly and publicly entered into, under circumstances of such notoriety, and so accessible to all citizens of that county, or any person seeking to purchase the land of the cognizor in that county where the title will naturally be examined, that it cannot operate to the injury of any one who will exercise reasonable prudence in such ex-

amination.   We see no cause to change this rule, and therefore hold a lien does exist as held in the cases referred to.

As a matter of course the principle we have stated is to be confined to such rules and decisions of our courts as have heretofore been announced, and have become a part of our own jurisprudence, not as British statutes, but as part of what well may be termed our own common law.   Such rules should not be extended beyond the principles which underlie them, and stand on the ground of having become established rules of law and property.

This brings us to the question, whether in view of the general provisions of our law on like questions, as well as sound policy, it should be held that this lien shall extend to all lands held by the cognizor in any other county in the State, as well as those owned by him in the county where the recognizance is acknowledged.   While no limitation of the lien was announced in the cases cited, none were required, as the land lay in the county where the recognizance was taken, and any expression of opinion as to whether it would attach to lands in another county would have been *mere dictum,* and not decision.

The question then is, shall the rule be extended farther than it has gone heretofore, so as to reach lands owned by the cognizor in another county, it may be in a distant county from that in which the record liability is created?

The analogies of our law and sound public policy are proper guides to the conclusion to be reached.

State *v.* Miller.

Our registration laws, and the liens given in cases of judgments of courts of record furnish the nearest resemblance to the question to be decided.

By our registration laws, conveyances of lands or fixing liens on lands, are required to be registered in the county where the land lies, unless it lies in two or more counties, and then it may be registered in either. Where the conveyance contains several tracts in different counties, it must be registered in each county where the land lies. Code, sec. 2032. If registered in a county contrary to these requirements, it is a nullity, and gives no notice. The reasons for these requirements are, that charges upon land should be recorded and found in the place where they would naturally be looked for, and the public inconvenience would be great if it was required that every county in the State should be examined for such charges.

In case of judgments and decrees of courts of record obtained in the county where the debtor resided at the time of their rendition, they are a lien upon the debtor's land from the time the same are rendered. Sec. 2980. But if rendered in any other county than that in which the debtor resides, the lien takes effect when a certified copy of the judgment or decree shall be registered in the county where the debtor resides, if he resides in the State, or if not, then in the county where the land lies. Sec. 2982.

Where the lien is to be fixed on equitable real estate, it must be registered in sixty days in the register's office of the county where the real estate is situated. Sec. 2984.

All these provisions indicate the policy of our State to be, that liens and charges on land, of record, shall be evidenced by a record at the locality where it would be most natural they would be searched for, and where least inconvenience will follow to parties seeking such information.

The reasons given by Judge Overton, in the case of *Glasgow* v. *Smith & Blackwell*, 162, Coop. Ed. Overton's Rep., why a judgment should not bind lands outside of the county where rendered apply with peculiar force to the question now under consideration.

After referring to the fact that our people, both as citizens and as witness and jurymen, habitually attend our courts, and thereby have knowledge of their proceedings, and that constructive notice ought not to be extended unreasonably; he asks, why ought a judgment be extended beyond this? No solid reason is seen to exist. " To oblige a man to examine the clerk's office of any county in the State before he can purchase land in safety is a greater burden than the law of England ever contemplated, or is consistent with the ordinary occupations of mankind." This however would be the burdensome result if we should hold a recognizance, a mere conditional obligation, should bind land beyond the county where given.

The case is much stronger against such a holding than the case of a judgment, because the judgment would be enforced at once by execution; but in the case of a mere recognizance, under our mode of enforcing them by *sci. fa.*, it may be years before the lien thus created shall be rendered certain by judg-

ment, and so the land may have been sold a dozen times to innocent purchasers; a party might enter into a recognizance in Shelby county, and it bind his lands in the other extreme of the State in Carter; a purchaser in Carter would have no suspicion of such a charge, and would be guilty of no neglect in not searching the records outside of that county, yet he might under the rule contended for lose his land by the lien in Shelby. A sound public policy forbids this extension of the rule beyond what has already been decided. No inconvenience can arise to the State in the future in taking bail, as the party will be received only on the faith of such property as he owns in the county where he enters into the obligation. If he desires to bind his other property he can easily do so by assigning it to others to take his place on the bond. In any event, if other lands outside of the county are to be bound, it should be by legislative regulation, in which provision can be made for notice in the county where the land lies, or otherwise, as may be deemed best. We have no power to guard the public interest by making such regulations, and therefore do not feel authorized to establish a rule that shall require them.

The result is the decree of the chancellor will be reversed, and the bill dismissed.

TURNEY, J., concurs in the result, but does not not agree with the reasoning as to English statutes.